**Joseph HENRY and Michael Malinky, Plaintiffs,**

v.

**CHAMPLAIN ENTERPRISES, INC., d/b/a CommutAir; Antony Von Elbe; John Arthur Sullivan, Jr.; Ernest James Drollette; Andrew Price; William L. Owens; Champlain Air, Inc.; and U.S. Trust Company of California, N.A., Defendants.**

No. 01–CV–1681.

United States District Court, N.D. New York.

Sept. 3, 2004.

Shayne & Greenwald Co., L.P.A., Gary D. Greenwald, Anne Marie La Bue, of Counsel, Columbus, OH, Attorneys for Plaintiffs.

DeGraff, Foy, Holt–Harris & Kunz, LLP, Terence J. Devine, of Counsel, Albany, NY, Attorneys for Plaintiffs.

Bond, Schoeneck & King, PLLC, Edward R. Conan, of Counsel, Syracuse, NY, Attorneys for Champlain Enterprises, Inc.; Champlain Air, Inc.; and all Individual Defendants.

Groom Law Group Chartered, Edward A. Scallet, Robert P. Gallagher, Lars C. Golumbic, of Counsel, Washington, D.C., Attorneys for Defendant U.S. Trust Company of California, N.A.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................... 255

II. FINDINGS OF FACT ......................................... 256
    A. CommutAir .............................................. 256
    B. Late 1993–CommutAir Develops Interest in ESOP Transaction ............. 256
        1. December 1993—CommutAir Speaks with U.S. Trust ................... 257
        2. Valuation Methodology ............................................. 258
        3. January 5, 1994—CommutAir Submits Management Projections .......... 258
        4. January 14, 1994—Kick-off Meeting ................................ 259
    C. January 17–20, 1994—Initial Offer and Retention of U.S. Trust ............. 260
    D. February 1994—Due Diligence, Fare Wars, U.S. Trust/HLHZ Meeting..... 261
        1. February 2, 1994—Due Diligence Meeting ......................... 261
        2. HLHZ Preliminary Valuation ....................................... 262
        3. East Coast Fare Wars ............................................. 262
        4. February 28, 2004—U.S. Trust Meets with HLHZ ..................... 262
    E. March 7 and 8, 1994—HLHZ Draft Opinion, Negotiation Meeting ............ 264
        1. March 7, 1994—U.S. Trust Receives HLHZ Draft Opinion .............. 264
        2. March 8, 1994—ESOP Team Meets With Sellers ...................... 265

F.   March 10 and 15, 1994—Transaction Approved and Takes Place . . . . . . . . . . . . . . 265
     1.   March 10, 1994—U.S. Trust Approves Transaction . . . . . . . . . . . . . . . . . . . . . 265
     2.   March 15, 1994—Transaction Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267
G.   Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

III.  CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268
A.   Section 406—Prohibited Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268
B.   Section 408(e)—Adequate Consideration Exception . . . . . . . . . . . . . . . . . . . . . . . 269
C.   Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271
     1.   Issues/Area of Concern . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271
     2.   Reasonable Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272
D.   Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

## I.  INTRODUCTION

Plaintiffs Joseph Henry and Michael Malinky (collectively "plaintiff"), who are participants in defendant CommutAir's Employee Stock Ownership Plan ("ESOP"), brought suit alleging various violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1104, 1105, 1106; seeking removal of fiduciaries under the equitable relief provision of ERISA, 29 U.S.C. § 1109(a); and asserting various other state law claims.

By Memorandum–Decision and Order dated October 27, 2003, plaintiff's state law claims were dismissed, as were all of its breach of fiduciary duty claims against defendants Antony von Elbe, John Arthur Sullivan, Jr., Ernest James Drollette, Andrew Price, William L. Owens, and Champlain Air, Inc.[1] Henry v. Champlain Enterprises, Inc. et al., 288 F.Supp.2d 202 (N.D.N.Y.2003). Most of plaintiff's breach of fiduciary duty claims against U.S. Trust Company of California, N.A. ("U.S. Trust")

and CommutAir were also dismissed.[2] Id. Familiarity with that decision is assumed.

A trial date was set for plaintiff's claims against U.S. Trust under ERISA Sections 404, 406, and 408, 29 U.S.C. §§ 1104, 1106, 1108. Prior to trial, the parties agreed that the dispositive issue was whether the March 15, 1994, sale of convertible preferred stock from the owners of CommutAir to the ESOP constituted a prohibited transaction under Section 406, not saved by the exception under Section 408(e). See Docket No. 142, Tr. Transcript, Vol. I at 53 ("MR. GREENWALD [counsel for plaintiff]: . . . The claim for breach of fiduciary duty under [§ ] 404 is a secondary claim that is subsumed within the prohibited transaction claim").

The matter was tried to the bench for six days in February 2004, and five days in April 2004, in Utica, New York. (Docket Nos. 126–31, 133–37.) Called as witnesses by plaintiff were defendant Andrew Price, plaintiff Joseph Henry, defendant Antony von Elbe, Jeffrey Risius, and Bradford Eldridge. Called as witnesses by both

---

**1.** Per the decision, defendants Anthony von Elbe, John Arthur Sullivan, and Ernest James Drollette were to remain in the case only in the event the remedy of disgorgement of profits was ordered following trial. Plaintiff has stated that it does not wish to seek such a remedy; therefore, defendants von Elbe, Sullivan, and Drollette will be dismissed from the case.

**2.** The cause of action seeking removal of fiduciaries under ERISA's equitable relief provision was not addressed in the decision, though it is here noted that such claim is no longer asserted against defendant William L. Owens, who is not now a member of the ESOP Committee; therefore, he will be dismissed from the case.

sides were defendant John Sullivan, Norman Goldberg, Andrew Stull, and Michael Shea. Called as a witness by defendants only was Robert Dana. Plaintiff and defendants thereafter submitted proposed findings of fact and conclusions of law. (Docket Nos. 153, 154) ("Pl.Prop.¶ ___" or "Def Prop. ¶ ___"). The following are the Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.[3]

## II. *FINDINGS OF FACT*

### A. *CommutAir*

CommutAir is a New York corporation based in Plattsburgh, New York engaged in the business of operating a regional commuter air service for public and private hire. (Stip.1.) It was formed in 1989 by defendants Antony von Elbe ("von Elbe"), John Arthur Sullivan, Jr. ("Sullivan"), and Ernest James Drollette ("Drollette") (collectively, "the sellers")—who each owned a 1/3 share of the company—and enjoyed significant growth and profit in its first years in business. (Pl. Prop. ¶ 13; Stip. 4.) The company had in 1989 a ten-year code-sharing agreement with USAir, whereby CommutAir would provide commuter services to certain cities to USAir passengers, paying a fee to USAir based on passenger volume in exchange for use of USAir's name, code, and ground support. (Vol. I at 105–09; Pl.Ex. 111.) Because by this agreement the company was USAir's "primary vehicle for market entry in the Northeast, CommutAir grew quickly from two planes to twenty-four planes." (Vol. II at 101.)

In early 1994, all of the planes in CommutAir's fleet were non-cabin class, and seated under twenty passengers. (Vol. I at 115–16.) It purchased its planes with financing from the manufacturer. *Id.* at 125. This provided the company with "a predictable cost structure" and allowed it "to have the lowest unit cost per departure if [it] were up against a carrier with larger equipment." (Vol. II at 100.) A competitor moving to larger planes, therefore, was a move CommutAir desired, because it could fill that competitor's place in the market. *Id.;* Vol. VII at 112–13.

In 1993, CommutAir, then thriving financially, was approached by investment bankers Prudential Securities and Alex Brown & Sons regarding a possible strategic alliance with another airline or an initial public offering. (Vol. III at 53; Vol. II at 206, 208.) Presentations along with written materials were separately given to the company by both firms. (Vol. III at 54–55; Vol. I at 99–100; Pl. Exs. 47, 49.) Though the written materials collectively indicated CommutAir had a total equity value ranging from $140 million to $225 million, the sellers did not consider them to be a formal valuation of the company, but rather "a ranking of [CommutAir] in the industry, some comparisons and so forth." (Vol. III at 56, 54; Vol. II at 207, 226.)

### B. *Late 1993—CommutAir Develops Interest in ESOP Transaction*

Sometime in late 1993, the sellers began exploring the possibility of establishing an ESOP and selling to it stock in the company, followed by an initial public offering "before the second half of 1995," the latter of which would tentatively be accomplished using an investment banker. (Vol. III at 20–21; Vol. VII at 119–120; Vol. II at 198; Pl.Ex. 187; Stip. 10.) "An ESOP is an

---

**3.** Eleven transcript volumes were filed after the bench trial. (Docket Nos. 142–52.) Citations herein to the transcript will be to volume and page number, i.e., Vol. I at 5. The parties stipulated as to several facts, (Docket No. 121), which will herein also be cited in short form, i.e., Stip. 1.

employee benefit plan that is designed to encourage employee ownership through investment in securities issued by a sponsoring company." (Def.Prop.¶ 10.)

Some time after presenting CommutAir a proposal, Robert Irwin, from Alex Brown & Sons, suggested that Sullivan contact Jack Curtis ("Curtis"), then an attorney with the law firm of Keck, Mahin & Cate ("KMC"). (Vol. VII at 124; Vol. II at 240.) The two spoke in late 1993, and Curtis informed Sullivan about the general framework of an ESOP transaction, including the hiring of legal counsel, an appraisal firm, and a trustee to represent the ESOP. (Vol. VII at 125.) They also spoke about the possibility of making the transaction financed by the owners, thereby eliminating the need for an investment bank in the process, which Sullivan believed would have made it "very cumbersome and expensive." *Id.* at 125–26.

### 1. *December 1993—CommutAir Speaks with U.S. Trust*

Curtis suggested that Sullivan contact U.S. Trust, a company that acted as a trustee for ESOP's both during and after transactions in which company stock is sold, and speak with Norman Goldberg ("Goldberg"). (Vol. III at 72, 103; Vol. VII at 126; Vol. II at 240.) Goldberg was a "senior fiduciary officer [in the special fiduciary services division at U.S. Trust] responsible for the relationships in connection with both transactions involving employer stock [and] transactions involving employee benefit plans." (Vol. III at 72.) He has significant experience in ERISA-related matters, having worked for the Department of Labor, an investment bank/financial advising firm, and a large, well-known appraisal company. (Vol. VII at 185–90; Def. Prop. ¶¶ 15–16.)

Goldberg has never prepared a valuation of a closely held corporation, and does not consider himself to be an expert in the same. (Vol. III at 71, 75.) He has, however, authored articles and prepared speeches on the legal consequences of valuing businesses, and can generally understand valuation reports. (Vol. III at 75–77.) Per year, he reviews approximately ten valuation reports prepared by financial appraisal firms hired by U.S. Trust, usually focusing on the narrative portion and leaving technical aspects to in-house financial analysts. (Vol. III at 77, 79.)

The in-house financial analyst in this case was Michael Shea ("Shea"). Shea's responsibilities included reviewing the financial appraiser's report and reporting to Goldberg on the reasonableness thereof. (Vol. V at 47.) He also was to actively participate in the financial appraiser's due diligence investigation of the company, and keep apprised of any developments.

Sullivan had a phone conference with Goldberg in late December of 1993. (Vol. III at 3; Vol. VII at 127; Vol. II at 240–41.) By this time, it was the sellers' belief, based on the presentations by investment bankers, that the company had a total equity value of $200 million, and that they wanted to sell approximately 30% of the company for $60 million. (Vol. III at 6, 10, 60, 61; Vol. II at 251.) They admit that no independent, formal valuation was performed to support a value of $200 million. (Vol. III at 11, 61; Vol. II at 253.)

As Goldberg echoed many sentiments expressed by Curtis, Sullivan's interest in a seller-financed ESOP transaction grew. (Vol. VII at 126–27.) At the end of the conference, Goldberg stressed the need for an appraisal of the company if U.S. Trust were to be hired to represent the ESOP in the proposed transaction, and advised Sullivan that there would be significant investigation of the company. (Vol. III at 104; Vol. VII at 128; Vol. II at 241–43.) Goldberg gave Sullivan a list of companies

specializing in ESOP transactions, one of which was Houlihan, Lokey, Howard & Zukin ("HLHZ"), which provided financial appraisal services. (Vol. II at 245.) Goldberg did not keep notes of his conversation with Sullivan. (Vol. III at 103–04.)

Following the conference, Sullivan conferred with the other owners of CommutAir, von Elbe and Drollette, and the three decided to meet face-to-face with U.S. Trust and the other potential members of the team that would represent the ESOP in the transaction. (Vol. VII at 128.) A "kick-off" meeting was slated for January 14, 1994, at the offices of KMC in Washington, D.C.

### 2. *Valuation Methodology*

At this point, before examining what, precisely, the relevant parties did or did not do in preparation for the transaction, it is helpful to give the proper context of what both plaintiff and defendants generally agree is the proper financial framework for assessing the fairness of the stock sale. Both sides agree that the primary component of any valuation is determining CommutAir's total equity value. To determine the total equity value, two valuation methodologies are employed— the discounted cash flow method ("DCF method") and the market capitalization method ("comparable companies method"). (Stip. 15; Vol. V at 206–07.) While the precise inner workings of the approach need not be detailed here, the major features about which the parties heatedly disagree are worthy of mention.

The DCF method, generally speaking, estimates the present day value of a company's projected future cash flows which would be theoretically available to the capital providers of the company. Central to the DCF method are projections of the company's future performance submitted by management. Because these projec-tions forecast results only for a discrete period of time, however, it is also necessary in the DCF to determine a terminal value, which is used to calculate the company's cash flows from the end of the projection period into perpetuity. Part of the terminal value calculation is the determination of the rate at which the company will be expected to grow into perpetuity. (Vol. V at 69.)

The comparable companies method derives a total equity value of a company based on how it compares to other similar companies on selected financial measures. Central to this approach are the selection of comparable companies against which to compare the subject company, and a comparative analysis of the subject company relative to the selected comparable companies. Financial measures by which to compare the companies must be selected, and it is usually determined whether the subject company, individually on the measures selected, falls above, at, or below the median of the same for the comparable companies. (Vol. V at 69; Vol. IV at 70–71.)

The total equity value of the company, derived from the DCF and comparable companies methods, is then used to determine if the proposed transaction—in this case, the sale of convertible preferred stock for $60 million—is appropriate. Certain features of the stock may be negotiated, which may drive the value of the stock up, down, or have no effect at all.

### 3. *January 5, 1994—CommutAir Submits Management Projections*

At some time in late December/early January, HLHZ was contacted regarding the proposed transaction. Just over a week prior to the kick-off meeting, defen-

dant Andrew Price ("Price"),[4] at the request of Sullivan, submitted management projections of CommutAir's future financial performance to Jack Berka, a managing director in HLHZ's Los Angeles office. (Pl.Ex. 108; Def. Ex. 2; Vol. I at 176.) The projections were forwarded to HLHZ employees Jerry Grossman and Andrew Stull ("Stull"). The forecast, which was prepared in November of 1993 for an investment banking group, used CommutAir's actual financial data from 1992 through October of 1993, and forecasted the company's performance through 1995. (Vol. 1 at 176–78.)

HLHZ asked Price to submit a revised forecast that projected performance through 1998. For the revised projections, Price incorporated data from the last two months of 1993. (Vol. I at 179; Pl.Ex. 109; Def. Ex. 6.) The forecast primarily utilized the last six months of 1993 for the projections, because, in Price's words, the industry was "ever-changing." (Vol. II at 10.) No explanation was submitted with the forecast, and Price does not recall specifically a meeting with HLHZ where he explained the underlying assumptions. (Vol. II at 11–12.)

Price admits that he did not review the FAA's annual aviation industry forecast from 1992 or 1993 before preparing the projections, he says because the forecast was company-specific, not of the industry. (Vol. I at 156–57, 167; Vol. II at 18, 104–05.) The 1993 FAA forecast projected a decline in growth for the segment of the regional commuter airline industry in which CommutAir was placed, i.e., those with planes with less than 20 seats. (Pl. Ex. 97; Pl.Ex. 92.) CommutAir had no plans to purchase or lease aircraft with more passenger seating, a segment of the industry the FAA indicated would see growth. (Vol. I at 169, 173.)

Shea claims he had a copy of the projections, but does not recall doing anything to verify the reasonableness of the projections other than speaking with Price and HLHZ. (Vol. IX at 191, 209; Vol. V at 160.) Goldberg did not personally review Price's projections. (Vol. III at 133–34, 137.) HLHZ never made any adjustments to the projections. (Vol. IV at 132.)

#### 4. *January 14, 1994—Kick-off Meeting*

The January 14, 1994, kick-off meeting was attended by Sullivan and von Elbe from CommutAir; CommutAir legal counsel William Owens; Robert Irwin from Alex Brown; Luis Granados, Curtis and Marsha Matthews from KMC; Goldberg from U.S. Trust; and Andrew Stull and Jerry Grossman from HLHZ. (Vol. III at 12, 58, 108; Vol. IV at 12.) The meeting, which lasted one to two hours, was labeled as an introductory meeting of all the potential entities that would be involved with the proposed transaction. (Vol. IV at 12; Vol. VII at 209.) The potential transaction was discussed in more detail. (Vol. VII at 129.) Neither U.S. Trust, HLHZ, nor KMC had been formally retained.

At the meeting, it was indicated that the transaction needed to be completed by March 15, 1994, which Goldberg stated was "[n]ot an unusually fast track for this type of transaction" but admitted is a "[m]oderately" fast track in general. (Vol. III at 120; Vol. VII at 211.) Robert Irwin, from Alex Brown & Sons, gave a presentation regarding the commuter airline industry, and gave certain documents

---

4. "Defendant Andrew Price has been President of CommutAir since on or about January 1, 1998, was Vice President of Administration from 1993 to 1998, was Director of Corporate Development from 1992 to 1993, and has been a member of the ESOP Administrative Committee since in or about January 1999. Ex. D–91." Stip. 7.

to HLHZ regarding CommutAir. (Vol. IV at 13, 30; Pl.Ex. 208.) The general terms of the proposed transaction were outlined, including: (1) the intention that a seller-financed, leveraged ESOP be created; (2) the sellers' desire to sell roughly 30% of the company to the ESOP for $60 million, on the basis of an estimated total equity value of $200 million; (3) the advantages of using convertible preferred stock as the security purchased; (4) the possibility of a aggregate dividend rate for the stock of 8%–10%, with 6%–7% of such rate fixed and the rest discretionary; (5) that the dividend on the preferred stock be cumulative; and (6) that the preferred stock have participation rights, so as to allow for the pay-down of the ESOP's debt on an accelerated basis. (Vol. III at 111–121; Vol. IV at 16–17; Vol. VII at 210–11.)

At the meeting, Goldberg did not inquire as to how the sellers came up with the $200 million total equity value for CommutAir, or have any preliminary opinion as to its validity. (Vol. III at 62, 122.) He did have a "fairly clear impression" that Alex Brown had performed some financial analysis of the company with respect to an initial public offering, though he neither saw, nor requested to see, the written materials that accompanied either investment banking firm's presentation to the sellers in 1993. (Vol. III at 109–110; *id.* at 54–57, 59.) He was also aware of CommutAir's "general business strategy" of following the creation of the ESOP with an initial public offering. (Vol. III at 118.) HLHZ was also aware that an initial public offering was contemplated, but that for tax and legal purposes, such a plan could not be undertaken until three years after the creation of the ESOP. (Vol. IV at 17–18.)

At that point, though U.S. Trust had not yet been formally engaged to represent the ESOP in the proposed transaction, Goldberg assessed the $60 million pro-posed purchase price from the standpoint of determining "what kind of security would support that value." (Vol. III at 113, 212.) In other words, the goal of U.S. Trust, if engaged, would be to determine if the security could be designed in such a way as to make the proposed purchase price fair. (Vol. III at 210–212.) In this regard, Goldberg felt that using convertible preferred stock as the security purchased would be helpful because of its susceptibility to enhancement. (Vol. III at 210.)

### C. *January 17–20, 1994—Initial Offer and Retention of U.S. Trust*

At the close of the meeting, Sullivan and von Elbe were made aware that the sellers had to make an initial offer to the ESOP in order for the proposed transaction to proceed. (Vol. III at 60, 125.) By letter dated January 17, 1994, written by either Sullivan or Owens, the company's legal counsel, a draft offer was prepared. (Vol. III at 34; Pl.Ex. 189.) The letter stated that the sellers would sell to the ESOP 30% of the company, which percent "[they] believe[d] to be valued at $60,000,000.00." (Pl.Ex. 189.) The letter anticipated that the purchase would be financed by a cash loan from CommutAir to the ESOP, which would be paid to the sellers, and promissory notes issued to the sellers for the balance of the purchase price. *Id.* The letter also stated the sellers' anticipation that the security purchased would be convertible preferred stock, which would have a fixed dividend of 6%–7% and would participate in any other dividends the company issued. *Id.* It was also stated that the transaction, for the sellers, was contingent on qualification for certain tax benefits under the Internal Revenue Code. *Id.* A copy of this draft offer was not given to Goldberg nor any party representing U.S. Trust. (Vol. III at 35, 126.)

By document dated January 19, 1994, the sellers transmitted to Goldberg their

initial offer. (Pl.Ex. 44.) In the document, references to Internal Revenue Code sections were added, probably by or at the insistence of Owens. (Vol. III at 37.) The document states that the sellers "propose to sell to an [ESOP] to be formed not less than thirty (30%) percent of the outstanding stock of [CommutAir] for a total purchase price of $60,000,000." (Pl. Ex. 44.) The offer reiterates the anticipation as to how the purchase would be financed, and notes again that the security would yield a 6%–7% cumulative dividend, as well as share in any other dividend or proceeds of liquidation. *Id.* The offer also added the sellers' anticipation "that, during the first twelve months following dosing, [CommutAir] will loan to the ESOP as much cash as it has available to enable the ESOP to refinance as much of its indebtedness to [the sellers'] as possible." *Id.* The draft language pertaining to the contingency of the transaction on favorable tax treatment under the Internal Revenue Code was also in the offer. *Id.*

That same day, in accordance with company policy, Goldberg sent U.S. Trust's special fiduciary committee—which was responsible for approving the engagement, (Vol. III at 129; Pl.Ex. 244)—a memorandum generally outlining the proposed transaction. (Vol. III at 130; Pl.Ex. 115; Def. Ex. 9.) On January 20, 1994, after discussing the matter for "anywhere from four to ten minutes," the committee approved U.S. Trust's engagement as trustee for the proposed transaction. (Vol. III at 133; Pl.Ex. 116; Def. Ex. 10; Stip. 11.) KMC was to serve as U.S. Trust's legal counsel for the transaction, and U.S. Trust retained HLHZ to serve as an outside financial advisor. (Stips. 12–13.)

### D. *February 1994—Due Diligence, Fare Wars, U.S. Trust/HLHZ Meeting*

Even before U.S. Trust accepted the engagement, Sullivan knew that a due diligence investigation of the company would commence. He started gathering company information, as did Price. (Vol. VII at 129; Vol. II at 113–15.) Both HLHZ and KMC forwarded to the company due diligence requests. (Def.Exs.5, 7.) Replies to the requests were sent back thereafter. (Def.Exs.120–21.) Shea also received some background information on CommutAir to prepare for a due diligence meeting. (Vol. V at 54.)

### 1. *February 2, 1994—Due Diligence Meeting*

A due diligence meeting was held on February 2, 1994, at CommutAir's headquarters in Plattsburgh, New York. Attending the meeting were Stull (from HLHZ), Michael Shea (from U.S. Trust), and Sullivan, von Elbe, and Price (from CommutAir). (Vol. IV at 21.) Prior to the meeting, Stull did some background research on the commuter airline industry, and in January and February received documents concerning CommutAir. (Vol. IV at 23; Pl. Exs. 205–08.) It is unclear exactly what was discussed at the due diligence meeting. Stull claims Price's projections were discussed, as well as the future expectations of the company and how competition might affect the same. (Vol. IV at 22, 24, 53.) Price does not recall the specific topics discussed, but believes his projections were discussed. (Vol. II at 116.) Shea could not specifically recall whether Price's projections were discussed, and there is no indication of the same in the notes he took, although he claims to have spoken with Price over the phone regarding the forecast after the meeting. (Vol. V at 62.) Stull also claims that it was discussed that the dividends paid to the ESOP would end once the debt to the sellers was paid. (Vol. IV at 25, 62.) Sullivan described the meeting as "rigorous" and claimed that he and others "were

grilled" for many hours concerning all aspects of CommutAir. (Vol. VII at 136.)

### 2. *HLHZ Preliminary Valuation*

Some time prior to February 28, 1994, Goldberg received from HLHZ a preliminary valuation of CommutAir. (Vol. III at 138; Def. Ex. 17.) In the document, HLHZ preliminarily concluded that the company had a total equity value of $180 million, based upon an average of the indicated values from the DCF and comparable companies methods. (Def. Ex. 17; Vol. IV at 48, 51, 52.) No effort was made in the document to value the convertible preferred stock, and no dividend rate for such stock was estimated. (Vol. III at 139; Vol. IV at 46; Vol. V at 67.) On the document appear several handwritten notes written by Goldberg, allegedly in preparation for a meeting with HLHZ to discuss the basis of their judgments. (Vol. III at 140.) Despite the fact that HLHZ listed no dividend rate for the convertible preferred stock, Goldberg wrote "6%," allegedly in reference to the sellers' proposal of a 6%–7% dividend rate. (Vol. III at 140; Def. Ex. 17.) In reference to the management projections submitted by Price, Goldberg wrote "1994—projections look robust," and later noted that "[e]quity risk high—judgment about forecasts uncertain." (Vol. III at 140, 146; Def. Ex. 17.) On several places on the schedule setting forth the comparative publicly traded company analysis, Goldberg made notations that HLHZ's selection of above-the-median multiples would have to be justified. (Vol. III at 141, 143; Def. Ex. 17.) He also made a notation indicating his desire for justification of the 9.5% long-term growth rate used by HLHZ in the valuation. (Vol. III at 146.) He claims that more of his concerns were verbalized, but were not in writing. (Vol. III at 144, 146.)

Shea claims that he had multiple phone calls with HLHZ, but has no notes reflecting the same. (Vol. V at 64.) Both he and Goldberg testified that, as a matter of course and in this case, they do not take many notes. (Vol. V at 67; Vol. VII at 12; Vol. IX at 197–98.) Shea testified that he did raise issues and likely made notes on his copy of the preliminary valuation, but that "[a]s a matter of practice, I don't retain prior drafts." (Vol. V at 68; Vol. IX at 192.) He admits to having no written evidence of any concerns he had with or voiced about the preliminary valuation. (Vol. V at 68.)

### 3. *East Coast Fare Wars*

On February 28, 1994, the Wall Street Journal ran a story opining that, due to a new entry in the East Coast airline market, fare wars were erupting that would have a detrimental effect on USAir, CommutAir's code-sharing partner, and other low-cost carriers. (Pl.Ex. 99.) Approximately one week later, the New York Times ran an article mentioning that all four major air carriers operating on the East Coast had cut prices on short flights. (Pl.Ex. 100.) Price was aware of the fare wars, and that USAir had already reacted to the new competition, but did not submit revised projections to HLHZ to take into account any impact on CommutAir, because he believed that fare wars historically had been short-term events. (Vol. II at 24, 48–76, 91.) He claims he had discussions about the fare wars and their impact with HLHZ and U.S. Trust, in which he told them that CommutAir would not be impacted, but admits he has no documentation proving the same. (Vol. II at 67, 116, 131.) U.S. Trust has produced no documentary evidence that the fare wars issue was ever raised with Price.

### 4. *February 28, 2004—U.S. Trust Meets with HLHZ*

Also on February 28, 1994, Stull met with Goldberg and Shea to discuss

HLHZ's preliminary valuation. (Vol. IV at 45, 55.) Goldberg said the purpose of the meeting was to receive a more formal presentation of the preliminary valuation, and that his and Shea's purpose was "to ask hard questions, to push and probe, and to assess their responses." (Vol. VII at 217.)

Goldberg and Shea, who took no notes at the meeting, testified that the issue of whether Price's projections were "robust" was raised, and that HLHZ's response was that they were not, but he cannot recall the specific reasons given. (Vol. VII at 220; Vol. VIII at 18; Vol. IX at 215.) Relatedly, on direct examination, Goldberg claims the issue of fare wars was raised, and that he asked HLHZ to speak with representatives from CommutAir, USAir, and others familiar with the industry to assess if such wars would have an impact. (Vol. VII at 221.) Stull, who did not mention in his February 2004 testimony that the fare wars were specifically discussed, affirmatively testified that they were in April 2004. (Vol. IX at 65–66.)

On cross-examination, however, Goldberg could not specifically recall whether he or Shea raised the fare wars issue, and admits there is no documentation showing that he asked HLHZ to further investigate. (Vol. VIII at 19; Vol. III at 180.) In fact, independent of the notes he made on the preliminary valuation, Goldberg has no recollection of what was discussed at the meeting, and there has been no evidence produced by either him or Shea as to what took place. (Vol. VIII at 23.) Likewise, Shea has no recollection of specific discussions at the meeting, or documentation of the same. (Vol. X at 11.)

Also raised, according to Stull and Goldberg, was the propriety of the 9.5% growth rate in the terminal value calculation. (Vol. IV at 49–50, 50–51; Vol. VII at 227–28; Vol. IX at 64.) Stull allegedly responded that, because the company had far exceeded this growth rate for a sustained period of time, the 9.5% rate was justified. (Vol. VII at 229.) Goldberg claims he nevertheless asked HLHZ to consider changing the rate, though he cannot recall whether he asked for different rates to be run. *Id.* Despite not specifically claiming so in his February 2004 testimony, Stull in April 2004 testified that U.S. Trust also asked him about the weighted average cost of capital being above the industry average. (Vol. IX at 68.)

Goldberg claims he also asked HLHZ why the selected multiples were above the median for the comparable companies. (Vol. VII at 231.) When first asked in February 2004, Stull could not specifically recall this issue being raised. (Vol. IV at 49.) When asked in April 2004, as a witness called for defendants, he claims he was asked and he responded with "qualitative commentary," citing the notes he made during the meeting. (Vol. IX at 58–59; Def. Ex. 20.)

Stull admitted on cross-examination that his notes, to which he cites for his statements that U.S. Trust asked him questions, do not specifically indicate that questions were posed to him. (Vol. IX at 118.) He claims that, despite not recalling in February 2004, he was able to remember that more specific topics were raised—such as the fare wars, the weighted average cost of capital, and the selection of above-the-median multiples—as follows: "with more time, I have been able to look at the information and form a better recollection of what happened." (Vol. IX at 121.)

It is important to note that Goldberg's and Shea's recollection of what was raised at the February 28, 1994, meeting come entirely from reviewing Stull's notes. (Def.Ex. 20.) Goldberg's copy of the pre-

liminary valuation do not indicate that he raised any issue with Stull, neither he nor Shea have any specific recollection of what was discussed, and neither took or produced any notes or other documentary evidence demonstrating the content of the meeting.

Following the meeting, Goldberg asked KMC to draft a security purchase agreement and the terms of the convertible preferred stock. (Vol. VII at 245.) He asked that the sellers' counsel be consulted on these issues and that preliminary negotiations be undertaken. *Id.* at 245–46.

### E. *March 7 and 8, 1994—HLHZ Draft Opinion, Negotiation Meeting*

#### 1. *March 7, 1994—U.S. Trust Receives HLHZ Draft Opinion*

Around March 7, 1994, Goldberg received a draft of HLHZ's "opinion memorandum" on the fairness of the proposed transaction. (Vol. III at 147; Vol. IV at 45; Def. Ex. 23.) In the document, HLHZ reduced to the total equity value of CommutAir to $174 million, after decreasing the indicated value under the comparable companies method to $179 million, and decreasing the indicated value under the DCF method to $169 million. (Def.Ex. 23.) The financial measure containing the highest selected multiples was removed from the draft. *Id.;* Vol. IV at 52, 53. Other than such removal, the multiples from the first draft were again used. (Vol. IV at 52.) The long-term growth rate was also changed from 9.5% to 9%. *Id.*

The information used for the comparable companies was from September 1993. (Vol. V at 23.) A fair portion of the comparable companies filed documents with financial information in them in February 1994. Stull and Shea maintain, however, that the most current information available was used in HLHZ's draft. (Vol. V at 96; Vol. IX at 56–57, 159.) Stull maintains

that he asked an information service provider from which HLHZ usually obtains such information if the information for the comparable companies was available; he was told it was not. (Vol. IX at 159.) Defendants' expert, Robert Dana, testified that the information for the comparable companies was available prior to the transaction date. (Vol. X at 169–70.) Shea does not remember if he checked whether the more current information was available, and has nothing in writing indicating that he did either. (Vol. V at 97, 100.)

For determining the comparable companies' trading price, HLHZ used a 20–day average prior to February 24, 1994, for the prices. Shea admits that he could have obtained the prices for each of the comparable companies on a daily basis, but did not do so, admits he never raised the issue, and that there are no documents showing that he did so. (Vol. V at 113–14.)

The multiples selected for CommutAir in the draft were, on average, significantly higher than those of the comparable companies. Shea knew that the charts produced by HLHZ which purport to give data justifying the multiple selections came from a particular source, but he did not request a copy of the same, and cannot recall whether he ever saw it. (Vol. V at 128–29.) He also cannot recall whether he prepared anything in writing documenting concerns over the chart. (Vol. V at 137.)

The draft also, for the first time, set forth some tentative terms of the preferred stock the ESOP would receive in the transaction. (Vol. IV at 57.) The dividend rate was stated as 7% cumulative, though Goldberg contends that HLHZ, in so stating, did not yet have the benefit of negotiations he undertook with the sellers to enhance the value of the security. (Vol. III at 148; Def. Ex. 23.) It was also stated that the dividends would be a mini-

mum of 10% and maximum of 50% of the company's fiscal year-end pretax income before profit sharing, up to a cap of 6% of the face amount. (Vol. III at 148; Def. Ex. 23.)

To determine the appropriate yield for the dividend, HLHZ used a survey of the convertible preferred securities of other companies. (Vol. IV at 57.) In the survey, the comparable companies are placed in deciles, and then the yield for the dividend to the ESOP is determined by averaging those companies in the decile in which CommutAir is placed. (Vol. IV at 58.) Shea does not recall if he asked to see a copy of the survey. (Vol. V at 101.)

Shea has no copy of the draft on which notes he may have made appear, or any other document reflecting issues he had or wanted to discuss with HLHZ concerning the draft. (Vol. V at 74–75.) He did not meet with HLHZ to discuss the draft. (Vol. V at 73.)

### 2. *March 8, 1994—ESOP Team Meets With Sellers*

In a March 8, 1994, meeting in Washington D.C., Goldberg engaged with the sellers in negotiations over possible enhancements to the convertible preferred stock. Shea did not attend the meeting. (Vol. V at 117.) Though Goldberg maintained no written notes of these negotiations—or apparently of anything else he did in connection with the transaction—he contends that proof of the negotiation efforts is reflected in the final deal itself. Among the issues Goldberg contends were negotiated include: (1) a limitation on management compensation; (2) the insertion of an anti-dilution provision; (3) a liquidation preference and redemption rights for the preferred stock; (4) full voting rights for the preferred stock; (5) the dividend rate for the preferred stock; (6) the participating feature of the dividend rights; and (7) the

perpetual nature of the dividend. (Vol. III at 186–204.) Goldberg admits that all of these alleged negotiations pertained to the value of and enhancements to the security, not the price for which it would be purchased. *Id.* at 206. In short, he contends, "It [was][']what do you get for sixty million dollars['] or [']what do you give up for sixty million dollars,['] that was the negotiation." *Id.*

Sullivan claims that the March 8, 1994, meeting represented "the first time that we had actually seen the proposed documentation for the deal," and that he and von Elbe were "surprised" that the documents contained substantive changes from the original offer. (Vol. VII at 138–39.) The changes came about, he claims, from discussions between the ESOP team and Owens, the company counsel. *Id.* at 138. Specifically, he claims the dividend rate had been raised and made perpetual. *Id.* at 139. This concerned him because he thought it might hinder the company's ability to engage in future transactions. *Id.* However, no mention had been made in the offer letter to U.S. Trust about whether the dividend was to be perpetual; it stated only that it would be a cumulative preferred participating dividend with no stated termination date. *Id.* at 162–63.

### F. *March 10 and 15, 1994—Transaction Approved and Takes Place*

### 1. *March 10, 1994—U.S. Trust Approves Transaction*

Goldberg received two faxes the morning of March 10, 1994, the day the special fiduciary committee was to meet to determine whether to approve the proposed transaction. The first was a due diligence report from KMC, dated two days earlier. (Vol. III at 161.) The second was a fax from HLHZ in which it was stated that "[t]he heavy fare reductions instituted by USAir in February 1994 as a preemptive

move against low-cost entrants, Southwest and CALite, are contributing to the company's widening losses." (Vol. III at 149; Pl.Ex. 125.) The fax went on to state that:

> USAir is expected to evaluate all aspects of its business in an effort to cut costs. There is some uncertainty for USAir's commuter franchisees as to the potential impact of contemplated cost cutting actions that USAir may initiate. However, as it is currently structured, USAir Express is satisfied from an economic standpoint with the arrangement it has with its commuter franchisees.

(Pl.Ex. 125.) Shea does not recall if he had conversations with HLHZ prior to this fax being sent, nor does he believe that he or anyone else from U.S. Trust obtained news articles concerning the fare wars prior to the March 15, 1994, transaction date. (Vol. V at 151, 155.) He does say that he "obviously investigated the issue at length with [HLHZ], as well as the management team, in the course of the due diligence with respect to this engagement," but does not specifically recall performing any research on the issue and admits that nothing is in writing documenting any such efforts. *Id.* at 157–58.

Included in the fax was a new page for the opinion memorandum revising the terms of the convertible preferred stock. Specifically, the cumulative dividend rate was changed from 7% to 9%, and the performance dividend was changed from the 10%–50% range up to 6% of the face amount, to 20% up to 3% of the face amount. (Pl.Ex. 125.) However, as a result of these changes, HLHZ did not change its opinion with respect to the value of CommutAir, as according to Goldberg it "still concluded [the ESOP] [was] receiving value in excess." (Vol. III at 151.) Price's management projections were also not altered in light of the infor-

mation in the fax. (Vol. III at 151; Vol. IV at 168.)

Mere minutes after the fax from HLHZ was received, the special fiduciary committee met to determine whether to approve the proposed transaction. (Vol. III at 155; Pl.Ex. 118; Def. Ex. 25.) The U.S. Trust policy manual indicates that before the committee is to reach a decision on a proposed transaction, it will have before it a financial report from the outside appraisal firm, and from in-house security analysts, if any, as well as "[a] 'comfort letter' from [its] legal advisors which, at a minimum, would detail the activities which have been performed by U.S. Trust as trustee and provide some level of comfort that U.S. Trust had complied with the policies and procedures as dictated by ERISA." (Pl. Ex. 244.) Shea could not recall whether he attended the meeting or not, though the minutes show that he did attend. (Vol. V at 76; Pl.Ex. 118.) At the meeting, Shea did not submit a written report, and neither Goldberg nor Shea could recall if either even made an oral presentation to the committee either. (Vol. III at 155–57; Vol. V at 77.) HLHZ did make a detailed presentation regarding its report, but Goldberg is unaware if the fax sent earlier that morning changed it in any way. (Vol. III at 157.) However, HLHZ did not submit to the committee its final opinion as to the fairness of the proposed transaction, instead submitting a draft of its opinion. *Id.* at 159. Likewise, KMC did not submit to the committee its final opinion pertaining to the legal issues involved in the transaction, instead just giving its views to the committee orally, followed later by an opinion letter. *Id.* at 160. Goldberg testified that "it is customary to operate this way," despite the language in U.S. Trust's policy manual. *Id.* at 157. The committee unanimously approved the proposed transaction. (Pl.Ex. 118.)

## 2. *March 15, 1994—Transaction Date*

On March 15, 1994, Goldberg received the final report from HLHZ regarding the transaction. (Def.Ex. 32.) HLHZ concluded again that the total equity value of CommutAir was $174 million, 30% of which is just over $52 million, and opined that the transaction was reasonably stated at $60 million due to the features of the convertible preferred stock. *Id.;* (Stip.16.) Shea claims he was aware of some changes from the draft to this final report, but he produced no documentation showing that he questioned HLHZ on the same. (Vol. X at 14–16.)

A stock purchase agreement was signed by CommutAir, the sellers, and U.S. Trust. (Def.Ex. 36.) Per the agreement, the sellers agreed to sell the ESOP 540,000 shares of convertible preferred CommutAir stock for $60 million. The sale was financed through a $9 million loan from CommutAir, and three promissory notes payable by the ESOP to the sellers. The convertible preferred stock was given a fixed annual 9% dividend, and a non-cumulative performance dividend. Dividend payments to the ESOP were to be used to pay down its indebtedness to the sellers, as were required contributions to the ESOP from CommutAir. Shares of stock are allocated proportionately to ESOP participants' individual accounts as the debt is retired.

### G. *Value*

HLHZ opined that based on its conclusion that the total equity value of CommutAir was $174 million, the $60 million sale price of the convertible preferred stock to the ESOP was reasonably and fairly stated, taking into account the value of the enhancements caused by the special features of the stock. Plaintiff's expert, Jeffrey Risius ("Risius"), concluded that the total equity value of CommutAir was just

under $106 million, and that the convertible preferred stock should have been valued at $41.5 million. (Vol. V at 205.)

Significantly, Risius does not dispute that the enhancements increased the value of the stock, conceding that "virtually all of the difference in value [of the stock], the eighteen and a half million dollars, essentially relates to the starting point, the total equity value[.]" (Vol. VI at 3–4.) Both HLHZ and Risius agree that the actual value of the convertible preferred stock sold to ESOP on March 15, 1994, was 30% of CommutAir's total equity value plus the value of the enhancements. There was only a minor, if any, disagreement on the value of the enhancements. The basic disagreement is CommutAir's total equity value on that date. Thus, only the total equity value need be discussed.

Initially, it is noted that some of the areas of concern, though not adequately addressed by U.S. Trust, end up having an immaterial impact on the total equity value of CommutAir. These areas relate to the fare wars and HLHZ's calculation of the weighted average cost of capital. Risius expressed disagreements with HLHZ on both issues, to be sure, but admitted that those differences did not impact the final value in any significant respect. (Vol. VI at 7–9, 123, 125–26.)

Some of his criticisms related to the growth rate selected for the terminal value calculation, the use of certain financial measures and selection of above the median multiples for CommutAir in the comparable companies method, are found to be valid in part. Particularly, while Risius bases a large portion of his growth rate calculation on industry-wide data, HLHZ almost entirely utilizes company-specific information. While Risius claims that only one financial measure need be used in the comparable companies method, HLHZ uses roughly sixteen. HLHZ does admit that the most on-point measure is the one

measure Risius used. (Vol. IV at 92; Def. Ex. 32.) While HLHZ found CommutAir to be at or above the comparable companies on virtually every measure, Risius found CommutAir to be at or below the comparable companies. This disagreement stemmed in part from the differing determinations as to the company's growth prospects, which, in turn, emanate from differences on whether a macro industry or micro company-specific approach is taken, and on whether the management projections forecast with respect to earnings growth was overly cautious (as HLHZ contends) or should be taken at face value (as Risius contends).

The technical valuation issues as they bear on fair market value rests largely on the credibility of the witnesses and experts and the methodologies employed by them. *See Eckelkamp v. Beste*, 201 F.Supp.2d 1012, 1028 (E.D.Mo.), *aff'd*, 315 F.3d 863 (8th Cir.2002)("Little case law exists on valuation, so often a court's conclusion is determined by its evaluation of the credibility and background of the witnesses who performed the valuation.")

Although correct and in agreement on many issues, the overall credibility of both HLHZ and Risius are in serious doubt.[5] HLHZ was advised before it even reviewed the matter, that the sellers wished to receive $60 million from the ESOP for a 30% interest in CommutAir. In other words, HLHZ did not start with an open mind or an independent approach to valuation. Not surprisingly, after weeks of favorably reviewing data and making adjustments to the terms of the convertible preferred stock, it arrived at the exact price in the initial offer of the sellers. On the other hand, Risius, as a retained expert by the plaintiffs, was clearly hired to make the case for the plaintiffs with as low a valuation as possible. He carefully selected from the various options to reach a result which would enhance the potential damage sustained by the ESOP.

At this time, over ten years after the transaction date and with no truly independent and objective expert opinion,[6] it is very difficult to access a fair market value for the convertible preferred stock purchased by the ESOP on March 15, 1994. Nevertheless, based on an evaluation of the credibility and background of all the witnesses; the difference between the opinions of the expert witnesses; and a review of all the testimony and the exhibits received into evidence, it is determined that the total equity value of CommutAir as of March 15, 1994, was $145 million. The fair market value of the convertible preferred stock purchased by the ESOP on that date was $52.5 million (30% of the total equity value plus enhancements).

## III. CONCLUSIONS OF LAW

### A. Section 406—Prohibited Transactions

Section 406 of ERISA prohibits transactions involving the "sale or exchange ... of any property between the plan and a party in interest," including the

---

5. Robert Dana, an expert called by defendants, also testified as to CommutAir's total equity value. His qualifications, however, are suspect in the particular context of appraising a company for the purpose of an ESOP transaction (Vol. X at 112–38), and, like Risius did with respect to his methodology for estimating the impact of the fare wars, Dana admitted that there was no support in the literature for his benchmarking analysis, or for his weighting analysis of multiples. *Id.* at 178; Vol. XI at 15–16. While his testimony has been considered for this decision, it has been given relatively little weight.

6. Consideration was given to the appointment, with the consent of the parties, of a special appraiser to provide such an opinion. Because it would have been a difficult, lengthy, and costly task, and because it was not certain that the issue of damages would even be reached, the idea was abandoned.

"acquisition, on behalf of the plan, of any employer security." 29 U.S.C. § 1106(a)(1)(A), (E). Because these transactions were of the type "that experience had shown to entail a high potential for abuse," Section 406 made them "illegal per se." *Donovan v. Cunningham,* 716 F.2d 1455, 1464–65 (5th Cir.1983). Thus, unlike breach of fiduciary claims made under Section 404, a party advancing a Section 406 claim need not prove that the prohibited transaction caused it harm. *Chao v. Hall Holding Co.,* 285 F.3d 415, 439 (6th Cir. 2002); *Reich v. Polera Bldg. Corp.,* No. 95 Civ. 3205, 1996 WL 67172, at *2 (S.D.N.Y. Feb. 15, 1996).

■ In this case, there is no question that each seller is a "party in interest," *see* 29 U.S.C. § 1002(14)(H), (C) ("an employee, officer, director, . . . or a 10 percent or more shareholder directly or indirectly," of "an employer any of whose employees are covered by [the] plan"), and that the transaction at issue involved the sale of CommutAir stock to the ESOP. Therefore, per the undisputed facts of this case, the March 15, 1994, sale of convertible preferred stock was a prohibited transaction under Section 406.

### B. Section 408(e)—Adequate Consideration Exception

However, "[d]oubtlessly recognizing that [the] absolute prohibitions [in Section 406]

would significantly hamper the implementation of ESOPs, particularly by small companies, Congress enacted in Section 408 a conditional exemption from the prohibited transaction rules for acquisition of employer securities by ESOPs and certain other plans." *Cunningham,* 716 F.2d at 1465; *see also Donovan v. Walton,* 609 F.Supp. 1221, 1229 (S.D.Fla.1985) (stating that "the practical necessities of the plan-union relationship made many of these prohibitions impractical, and thus the DOL promulgated specific exceptions to the per se rules"), *aff'd,* 794 F.2d 586 (11th Cir. 1986). Thus, " 'to encourage employees' ownership of their employer company,' " *Chao,* 285 F.3d at 425 (quoting *Kuper v. Iovenko,* 66 F.3d 1447, 1458 (6th Cir. 1995)), Section 408(e) permits the sale of employer stock by a party in interest to an ESOP so long as the same is "for adequate consideration," 29 U.S.C. § 1108(e). In transactions involving securities with no recognizable market value, as is the case here, ERISA defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee . . . pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." [7] *Id.* § 1002(18).

■ Invocation of the "adequate consideration" exception, therefore, requires

---

7. Recognizing that the definition of "adequate consideration" will be "of particular importance to the establishment and maintenance of ESOPs," the Department of Labor in 1988 issued a notice of proposed rulemaking in which it sought to "clarif[y]" the meaning of the term. Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed.Reg. 16732–01 (proposed May 17, 1988) (to be codified at 29 C.F.R. § 2510–3(18)(b)). In the proposed regulation, the DOL stated that a fiduciary seeking to invoke the adequate consideration exception must prove the following:

First, the value assigned to an asset must reflect its fair market value. . . . Second, the value assigned to an asset must be the product of a determination made by the fiduciary in good faith. . . . The Department will consider that a fiduciary has [properly] determined adequate consideration . . . only if both of these requirements are satisfied. *Id.* While the proposed regulation, after sixteen plus years, has yet to be approved for publication in the Code of Federal Regulations, *see* Unified Agenda, Adequate Consideration, 69 Fed.Reg. 37812–01 (Jun. 28, 2004), most courts have embraced the two-part test

proof of (1) the fair market value of the asset, (2) as determined in good faith by the fiduciary. U.S. Trust bears the burden of proving both of the elements of the exception. *Keach v. U.S. Trust Co. N.A.*, 313 F.Supp.2d 818, 866–67 (C.D.Ill.2004); *Reich v. Valley Nat'l Bank of Ariz.*, 837 F.Supp. 1259, 1272 (S.D.N.Y.1993).[8] The focus herein will be on the second element.

While claims under § 406 are distinct from regular breach of fiduciary duty claims under § 404, in that proof of loss is not required under the former, *Horn v. McQueen*, 215 F.Supp.2d 867, 876 (W.D.Ky.2002), it is beyond cavil that a prohibited transaction claim must be analyzed keeping in mind the § 404 duties that fiduciaries always have when acting on behalf of a plan. *Cunningham*, 716 F.2d at 1467–68; *see also* Def. Prop. p. 70, ¶ 3 ("A court reviews the 'good faith' determination by the trustee in light of the general duties of fiduciaries that are set out in Section 404 of ERISA"); Pl. Prop. ¶ 256 ("The statutory reference to 'good faith' ... must be read in light of the overriding fiduciary duties set forth in ERISA Section 404").

Section 404(a) has been described by the Second Circuit as mandating the following: " '[a] fiduciary must discharge his duties solely in the interests of the participants and beneficiaries. He must do this for the exclusive purpose of providing benefits to them. And he must comply with the care, skill, prudence, and diligence under the circumstances then prevailing of the traditional prudent man.' " *Devlin v. Blue Cross & Blue Shield*, 274 F.3d 76, 88 (2d Cir.2001) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.1982) (Friendly, J.) (internal quotations and citation omitted)), *cert. denied*, 537 U.S. 1170, 123 S.Ct. 1015, 154 L.Ed.2d 911 (2003). Relevant to this case is the "strict prudent person" standard, *John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 367 (2d Cir.1994), which is "[t]ypically" used when a challenge is made to a fiduciary's investment decision, *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir.2001). This "strict" standard, derived from the law of trusts, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 152–53, 105 S.Ct. 3085, 87 L.Ed.2d 96, (1985), has been described as " 'the highest known to law.' " *Flanigan*, 242 F.3d at 86 (quoting *Bierwirth*, 680 F.2d at 272 n. 8); *see also Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir.1984) (stating that duty "imposes [upon] fiduciaries an unwavering duty ...

for adequate consideration enunciated therein, as well as most of the principles relevant to the two parts, *see infra* note 8.

**8.** The Eighth Circuit appears to be the only federal appellate court that permits the exception to be invoked where only one element is proven by the fiduciary. *See Herman v. Mercantile Bank, N.A.*, 143 F.3d 419 (8th Cir. 1998). Particularly, the panel in *Herman* stated that "[e]ven if the trustee fails to make a good faith effort to determine the fair market value of the stock, '[it] is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.' " *Id.* at 421 (quoting *Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir.1994)). In other words, while the district court is not required to pinpoint the precise value of the stock at the time of the transaction, it must exempt the transaction from Section 406 if it finds that a prudent fiduciary would have paid the same price, regardless of the fiduciary's conduct. *Id.* at 422. This excusal of the good faith requirement, aside from being unsupported by the language of ERISA, has not been embraced by any other federal appellate court. *See, e.g., Chao*, 285 F.3d at 436; *Eyler v. Comm'r of Internal Revenue*, 88 F.3d 445, 454–55 (7th Cir.1996); *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 434 (3d Cir.1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.1984); *Cunningham*, 716 F.2d at 1467; *Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9 th Cir.1983).

to make decisions with single-minded devotion to a plan's participants and beneficiaries").

■ " 'A fiduciary's *independent* investigation of the merits of a particular transaction is at the heart of the prudent person standard.' " *Valley Nat'l Bank of Ariz.*, 837 F.Supp. at 1273 (quoting *Whitfield v. Cohen*, 682 F.Supp. 188, 194 (S.D.N.Y. 1988)). This investigation must be "careful and impartial," *Bierwirth*, 680 F.2d at 271, and the focus of the reviewing court will be on whether, at the time of the transaction and under the circumstances then prevailing, the fiduciary "employed the appropriate methods to investigate the merits of the investment and to structure the investment," *Katsaros*, 744 F.2d at 279.

■■ A fiduciary's receipt of an outside assessment from an appraiser may be considered evidence of a prudent investigation, but by itself " 'is not a complete defense to a charge of imprudence.' " *Chao*, 285 F.3d at 430 (quoting *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir.1996)). Indeed, "[a]n independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are filled." *Cunningham*, 716 F.2d at 1476. Rather, the fiduciary must demonstrate that it "employed sound principles of evaluation in accepting [the] appraisal[ ] and other means for determining the consideration to be paid" in the transaction. *Montgomery v. Aetna Plywood, Inc.*, 39 F.Supp.2d 915, 936 (N.D.Ill.1998). In other words, keeping in mind that the prudent person standard is objective and that the fiduciary—whatever its competence in the valuation field—is judged from the standpoint of a reasonable fiduciary, the fiduciary must "provide the expert with complete and accurate information," and employing sound valuation principles, "make certain that reliance on the expert's advice is reasonably justified

under the circumstances." *Chao*, 285 F.3d at 430; *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 301 (5th Cir.2000); *see also* Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 16732–01 (proposed May 17, 1988) (to be codified at 29 C.F.R. § 2510–3(18)(b)).

### C. *Analysis*

■ Therefore, it is not enough to merely show that when faced with a debatable choice on an issue, U.S. Trust (or HLHZ, upon which U.S. Trust placed reliance) simply opted for one of many reasonable choices. Likewise, the burden of proving the adequate consideration exception is not fulfilled by showing that the result was correct. Rather, the above principles clearly focus on the fiduciary's conduct in getting to the result. In other words, it is what U.S. Trust did or did not do in reaching its choice that requires attention. Thus, whether U.S. Trust carried its burden of demonstrating entitlement to the adequate consideration exception to the prohibited transaction rule depends upon the resolution of two questions: (1) whether there are legitimate issues or areas of concern that needed to be addressed prior to the March 15, 1994, transaction date; and (2) if so, whether U.S. Trust adequately addressed those issues or areas of concern through a reasonable investigation and reliance on HLHZ's fairness opinion.

### 1. *Issues/Areas of Concern*

Even if U.S. Trust had a clear view on which option to pick, there can be little doubt that this transaction involved making choices on numerous issues or areas of concern in the months and days leading up to the March 15, 1994, transaction date. Most prominent among these issues were: (1) with respect to the DCF, the propriety of the management projections submitted

by Price and the terminal value calculation, (Vol. V at 69); and (2) with respect to the comparable companies method, the propriety of the selection of the comparable companies, the financial measures (Vol. IV at 73), and the multiples for CommutAir (Vol. IV at 73), and whether the most current information was used, (Vol. V at 69).[9]

## 2. *Reasonable Investigation*

Among the duties Goldberg acknowledges is required of an ESOP trustee relying on the report of an outside financial appraiser is to "evaluate the report, ask the kinds of questions that a sophisticated investor would ask, assess the quality of the response, and ultimately make a judgment whether or not it is prepared to rely on that valuation." (Vol. VII at 201; Def. Prop. ¶ 17.) U.S. Trust cannot demonstrate by the record in this case that it has carried its burden in discharging this duty. At best, it cannot be answered whether U.S. Trust properly evaluated HLHZ's report, asked the difficult questions, and assessed the responses to those questions. At worst, it failed to do these things. Either way, with the burden squarely on U.S. Trust's shoulders, the adequate consideration exception has not been proven to apply. Simply put, in connection with this multimillion dollar transaction, in purporting to execute fiduciary duties that are the highest known to the law, U.S. Trust barely produced a shred of evidence that shows what Goldberg and Shea did.

In the three-month period prior to the transaction, the only evidence of anything Goldberg or Shea wrote down with respect to HLHZ's various reports were

Goldberg's notes contained on the preliminary valuation, and small notes Shea made on the revised projections. The only other written evidence of his work produced by Shea were a few pages of notes taken before, during, and after the due diligence meeting. Even accepting as true that this evidence, though slightly ambiguous, was intended to raise questions in their minds about some of the areas of concern, they produce no evidence, created by themselves, that they actually posed questions to HLHZ about these issues. Defendants make much of Stull's notes concerning the February 28, 2004, meeting, and how these notes refreshed Goldberg's and Shea's recollections ten years later, a time gap they both repeatedly cite as a reason why specifics cannot be recalled regarding what they did. However, the notes themselves do not state that they were made in response to any question from Goldberg or Shea. Further, Stull in his February 2004 testimony could not recall specifically that anything other than the growth rate was raised by U.S. Trust. It was only during his testimony a few months later, in April 2004, that he claims the specific areas of concern were raised. Goldberg and Shea admit that, independent of those notes, they have no specific recollections of what they asked HLHZ—at any time, really—and no documentation created by them that would fill in the gaps. In any event, Stull's notes pertained to the preliminary valuation—not the subsequent draft valuation presented to U.S. Trust's special fiduciary services committee. No documentation exists reflecting further discussions.

Even assuming, *arguendo*, that Stull's notes do reflect that questions were raised

---

**9.** With respect to the features of the convertible preferred stock purchased by the ESOP, it is noted that there is also an issue of concern, not whether such features enhanced the value of the stock, as even plaintiff's expert admits they did (Vol. VI at 3–4), but whether

U.S. Trust has proven that it made a good faith effort to negotiate these terms. To the extent this issue is viewed in isolation—and not in connection with the two mentioned areas of concern—no opinion is expressed on the same.

about the issues of concern, U.S. Trust has introduced no written evidence offering Goldberg's and Shea's assessment of HLHZ's responses. It claims that their comments, assessments, and questions are reflected in the final product—that the proof is in the pudding, so to speak. (Vol. VII at 14.) Such an argument retards the process. As noted, the focus of the good faith inquiry is not on the end—the final product—but on the means—the conduct of the fiduciary in getting to the final product. U.S. Trust has produced little if any probative evidence demonstrating, frankly, what it is Goldberg and Shea did.

Thus, the only basis from the record for believing that the issues of concern were adequately investigated and addressed, is the word of U.S. Trust and its witnesses that they did so. Initially, it is noted that U.S. Trust, and especially Shea, claimed only in the broadest terms that discussions concerning the areas of concern ensued. A typical piece of testimony by Shea—who was charged with doing most of U.S. Trust's legwork on the transaction—was that the issues were addressed in general, but that he does not recall the specific topics or responses. In fact, Shea did not recall whether he did something continuously throughout his testimony. *See, e.g.,* Vol. V at 61 (no specific recollection of what was discussed at February 28, 1994, meeting); *id.* at 63 (does not recall whether he left due diligence meeting with additional documentation); *id.* at 77 (does not recall if he participated verbally in March 10, 1994, meeting of U.S. Trust special fiduciary services committee); *id.* at 92 (does not recall if he saw Alex Brown & Sons materials); *id.* at 100 (does not recall if checked for availability of comparable companies' public filings); *id.* at 102 (does not recall if he realized difference between draft valuation and final report); *id.* at 129 (does not recall if examined document underlying chart that showed CommutAir's growth relative to comparable companies); *id.* at 137 (does not recall preparing anything in writing documenting concerns or issues about capital analysis or earnings growth charts prepared by HLHZ); *id.* at 140 (does not recall if Value Line Survey is only document he examined to check CommutAir's decile placement in HLHZ draft); *id.* at 143 (does not recall if voiced concerns to HLHZ about CommutAir's decile placement); *id.* (does not recall if asked HLHZ why the mean yield from decile ten was removed from the final opinion but was in draft); *id.* at 148 (does not recall if his notes on revised projections are only documentation he created regarding projections); *id.* at 151 (does not recall if he had discussions with HLHZ about supplement concerning fare wars, faxed to U.S. Trust, prior to March 10, 1994); *id.* at 154 (does not recall any discussions with USAir officials regarding Continental's CALite entry into the market); *id.* at 155 (does not recall if he obtained any news articles prior to the transaction date regarding Continental's expansion plans); *id.* at 157 (does not recall doing any independent research regarding the impact of the fare wars); *id.* at 160 (does not recall doing anything to verify management projections other than allegedly speaking with Price and HLHZ); *id.* (does not recall even telling Goldberg that the projections were reasonable); *id.* at 165 (does not recall asking for a copy of the FAA report cited by HLHZ in its report); *id.* at 167 (states that he "did quite a bit of research to obtain the growth rate" for company with business plan like CommutAir, but does not recall what materials he examined); *id.* at 175 (does not recall if he questioned certain use of pricing multiples); *id.* at 182 (does not recall doing anything, other than talking with HLHZ, to test the reasonableness of the growth rate); Vol. IX at 11 (does not recall specif-

ic discussions at February 28, 1994, meeting); *id.* at 12 (does not recall whether he or Goldberg asked HLHZ to run numbers using different growth rate than was in preliminary valuation); *id.* at 13 (does not recall whether he knew financial measures in final report were different than those used in preliminary report, in comparable companies method).

While it is certainly understandable that an individual would not be able to recall specific actions or discussions ten years later, such is the reason why documentation is effective, especially when representing an ESOP in a multimillion dollar deal, especially when you are aware of high fiduciary duties to that ESOP, and especially when you can anticipate—given those duties and that deal—that litigation is a possible outcome, however small that possibility may be.

While it is accepted that U.S. Trust and HLHZ are both leaders in their respective fields, in the absence of objective evidence demonstrating a reasonable investigation of the areas of concern, this alone, or even coupled with self-serving testimony that U.S. Trust, generally and in this situation, went above and beyond the call of duty for an ESOP fiduciary, is insufficient. Such a conclusion is especially appropriate when it is once again emphasized that U.S. Trust—not plaintiff, not HLHZ, not CommutAir—bears the burden of proving that an adequate, good faith investigation was undertaken. Were it otherwise, the question might be closer. Here, however, it is not otherwise, and it cannot be stated on the record introduced at trial that U.S. Trust has carried its burden.

Therefore, based on the evidence presented at trial, U.S. Trust has failed to demonstrate entitlement to the adequate consideration exception. The sale of convertible preferred stock to the ESOP, ac-cordingly, was a prohibited transaction under ERISA.

### D. *Damages*

That U.S. Trust failed to adequately engage in its good faith duty to investigate the merits of the transaction as a whole, and of HLHZ's work specifically, however, does not mean that plaintiff suffered damages as a result. As noted, it is quite possible that despite a fiduciary's failure in this regard, the resulting deal, or transaction price, can still be fair and reasonable. If the fair market value as determined herein is significantly lower than the $60 million the ESOP paid for the convertible preferred stock, the damages awarded will be the difference between the two.

The total equity value of CommutAir as of March 15, 1994, was $145 million, and the fair market value of the convertible preferred stock purchased by the ESOP was $52.25 million. The ESOP paid $60 million for the convertible preferred stock that was only worth $52.25 million. This is significant. Therefore, damages caused by the prohibited transaction are $7.75 million.

### IV. *CONCLUSION*

U.S. Trust has failed to prove that it engaged in a good faith investigation of the merits of the transaction at issue in this case—the sale of 540,000 shares of convertible preferred stock from the sellers to the ESOP. It was able to produce little if any documentation at trial demonstrating the efforts of Goldberg or Shea, with respect to the transaction details in general, and HLHZ's analyses in particular. Thus, the transaction was a prohibited transaction within the meaning of ERISA.

The damages flowing from the prohibited transaction, however, are less than demanded by plaintiff. Specifically, it is found that on March 15, 1994; (1) the total

equity value of CommutAir was $145 million; (2) the convertible preferred stock sold to the ESOP for $60 million had a fair market value of $52.25 million; and (3) the plaintiffs were damaged in the amount of $7.75 million.

Accordingly, it is

ORDERED that

1. Plaintiffs Joseph Henry and Michael Malinky, on behalf of the CommutAir Employee Stock Ownership Plan, are awarded $7.75 million against defendant U.S. Trust Company of California, N.A. on Count One of the complaint;

2. The complaint is DISMISSED against the defendants Antony VanElbe, John Arthur Sullivan, Jr., Ernest James Drollette, and William L. Owens.

IT IS SO ORDERED.