11-1263-cv
Krist v. Kolombos Rest. Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2011

(Argued:  May 18, 2012          Decided:  July 24, 2012)

Docket No. 11-1263-cv

_____

CHERYL KRIST,

Plaintiff-Appellant,

- v. -

KOLOMBOS REST. INC.,

Defendant-Appellee.
_____

Before:  KEARSE, CARNEY, and WALLACE[*], Circuit Judges.

Appeal from a judgment following bench trial before the United States District Court for the Southern District of New York, George B. Daniels, Judge, dismissing discrimination claims brought against restaurant under, inter alia, Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 et seq., for inhospitable treatment with regard to health-service dog.

Affirmed.

MARTIN J. COLEMAN, Woodbury, New York, for Plaintiff-Appellant.

ARTHUR H. FORMAN, Forest Hills, New York, for Defendant-Appellee.

_____

[*]  Honorable J. Clifford Wallace, Judge, of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

KEARSE, Circuit Judge:

Plaintiff Cheryl Krist appeals from a judgment entered in the United States District Court for the Southern District of New York following a bench trial before George B. Daniels, Judge, dismissing her complaint alleging that defendant Kolombos Rest. Inc. ("Kolombos"), a New York City restaurant doing business as Coopertown Diner ("Coopertown" or the "restaurant"), discriminated against her on the basis of her disabilities in violation of Title III of the Americans with Disabilities Act ("ADA" or the "Act"), 42 U.S.C. §§ 12181-12189; New York State Executive Law §§ 290-301 ("State Human Rights Law"); and New York City Administrative Code §§ 8-101 to 8-703 ("City Human Rights Code" or "City Code"). Krist, who has been disabled since at least 2003, complained that beginning in late 2008, when she acquired a service dog, Kolombos discriminated against her by, inter alia, attempting to restrict her access and that of the dog to the restaurant and by verbally harassing her on account of her disability and use of the service dog. The district court entered judgment in favor of Kolombos after finding that Kolombos had not denied Krist full and equal access to and use of the restaurant, either with or without her service dog, and ruling that restaurant employees' comments, which Krist considered to be rude or insensitive, did not constitute a violation of the ADA. On appeal, Krist contends principally that the district

court erred (1) by basing its decision on the premise that a plaintiff complaining of a violation of Title III of the ADA is required to establish that discrimination was intended, (2) by failing to find that Krist was actually excluded from the restaurant, and (3) by failing to construe the ADA as imposing a code of civility and to rule that Kolombos violated the ADA by constructively excluding Krist from the restaurant. Concluding that there is no error of law or clear error of fact in the district court's decision, we affirm the judgment.

## I.  BACKGROUND

The following description of the facts is drawn from the district court's findings as to the course of events, made on the record at the end of the three-day bench trial (see Trial Transcript ("Tr.") at 299-307), most of which have not been challenged by Krist, and from testimony of Krist and Kolombos' owners, most of which is consistent with the court's findings.

Krist, who suffers from several afflictions, including hereditary essential tremor, arthritis, and asthma, has been manifestly disabled since at least 2003, causing her to require the assistance of walking aids or a wheelchair.  She was a customer of Coopertown for some 20 years, beginning in approximately 1988,

-3-

frequenting the restaurant several times a week. Between 2003 and December 2008, Krist went to Coopertown nearly every day for breakfast and lunch. She usually arrived around 9:00 a.m. and remained there until around 2:30 p.m. Coopertown became her primary social community, in which her friends were other customers, Coopertown employees, and the restaurant's current owners, Michael Kolombos and his cousin Fotios Batas. During this period, Krist would arrive at the restaurant using a cane, crutches, or a wheelchair, and she experienced no discrimination.

In or about December 2008, Krist obtained a medically-prescribed service dog that accompanied her to the restaurant. Batas testified that when Krist told him in late November that she was about to acquire a service dog and would be bringing it to the restaurant, he told her that that was permissible as long as the dog was licensed and was truly a service dog; otherwise, he indicated, the dog would be excluded in order to avoid the restaurant's being penalized by the health department. However, Krist testified that on December 11, 2008, on her first trip to Coopertown with the dog, her treatment by the Kolombos employees, and by the friends with whom she normally congregated at the restaurant, changed radically.

Coopertown, for Krist, had been "like . . . Cheers, . . . you went in and you knew people and people knew you and you were friendly and everything was fine." (Tr. 88-89.) But after she

-4-

began bringing the dog, "it all went right out the window." (Id. at 89.) The employees' dealings with her "all became very cool. It was just take my order, give me my food, give me my receipt and hope I leave." (Id. at 67.) The first time she took the dog to the restaurant, Joe Mugno, a waiter with whom she frequently had had lunch, asked her if her dog was a service dog, using a tone of skepticism. Krist responded that it was a service dog, and she and Mugno had no further conversations about the dog; but Mugno never had lunch with her again. Krist testified that on this occasion, none of the other employees of the restaurant spoke to her, even to exchange pleasantries. In addition, one of the customers, who had sat with Krist every day she was at Coopertown for 10 years, refused to sit with her, never sat with her again, and stopped speaking to her. (See id. at 101-02.)

Krist also testified that there were incidents in which Batas or Michael Kolombos "yelled" at her. Thus, on her second visit to Coopertown with the dog, a few days after the first, Batas, from behind the counter on the opposite side of the restaurant, stared at the dog and made growling sounds. Krist testified that when the dog then made a sound that Krist said was not a bark but sounded like "boof," Batas yelled at her that the dog was barking and he ordered her to leave the restaurant. (Tr. 55.) She testified that on another occasion in December 2008, after she took

-5-

the dog out from under her table to show it to another customer, Batas yelled at her, complaining that she was playing with the dog. (See id. at 68-69.)

After Batas yelled at her on her second visit to Coopertown with the dog, Krist had complained to Michael Kolombos. Krist testified that Michael Kolombos said "[t]hat I was welcome" to have the dog in the restaurant but that "I should sit in the front of the store" and should "[e]at my breakfast and go." (Tr. 63-64.) Thereafter, Krist began going to the restaurant less frequently; she went approximately every other day. She sat at a front table perhaps three times but then resumed sitting in the back in her favorite booth. She would arrive at about 9 a.m. and stay until around noon (see id. at 117); but, she testified, "I didn't [stay to] eat lunch because no one"--meaning "Joe [Mugno] or any of his sons or any of the other waiters or anybody"--"would eat lunch with me so there was no sense in staying" (id. at 67).

Krist also testified that there was an incident in February 2009 and another in the summer of 2009 in which Batas and Michael Kolombos, respectively, yelled at her for having the dog lie beside her chair or her booth, rather than under the table, and potentially imperil customers and waiters. (See Tr. 70-73, 85-86.) Batas and Michael Kolombos similarly testified that on those

occasions, when they asked Krist to move the dog, Krist had put the dog in the aisle. (See id. at 190, 246.)

In September 2009, Krist stopped going to Coopertown. In December 2009 she filed the present action seeking injunctive relief and compensatory and punitive damages, alleging that on various occasions in 2008 and 2009, the restaurant's owners yelled at her and discriminated against her on the basis of her disability and use of the service dog, in violation of federal, New York State, and New York City laws. Krist's attorney argued that punitive damages were warranted because the Kolombos owners knew the law; "and, having read the law at an early stage, they went on to do things that drove a person to tears and drove them [sic] ultimately to, after seven or eight months or nine months, to exclude herself from her only real significant social community." (Id. at 298.)

Following the trial, at which the court had heard testimony principally from Krist, Michael Kolombos, and Batas, the court made findings of fact generally consistent with the above--except that it rejected Krist's testimony that either Kolombos owner had ever ordered her to leave the restaurant: It found that Krist "was never forced to leave the restaurant" (id. at 302; see also id. at 301).

The court ruled that Krist had failed to prove that Kolombos "did not attempt to reasonably accommodate her use of a

-7-

service dog" (id. at 302); that there was "no evidence that these owners either attempted to deny [Krist] access to the restaurant, provide[d] less or different services, [or] exclude[d] her or the dog from the restaurant" (id. at 303); and that there was

> no evidence that any of these owners of this restaurant or employees of this restaurant treated plaintiff any differently because she was disabled. There is no evidence of that from the 20 years before she had the dog, and there is no evidence of that when she got the dog

(id. at 304; see also id. ("I cannot say that they didn't reasonably accommodate the use of the service dog, even though it created additional issues that, obviously, are relevant in the context of a restaurant and places where people come to have their meals.")).

The court found that Krist had continued to patronize the restaurant with the service dog for some 10 months in virtually the same manner as she had before acquiring the dog. (See Tr. 306.) It found that she "went to the restaurant with the dog dozens and dozens of times" (id. at 301-02); that although there were some discussions between Krist and Michael Kolombos as to whether Krist could sit at various tables, "she continued to sit exactly where she wanted to sit" (id. at 302); that she stayed for "hours and hours" (id. at 303); and that "whatever conversations there were about her leaving the restaurant on a particular day . . . , it was clear that she was never forced to leave the restaurant . . . ." (id. at 302). Krist decided when to arrive and when to leave, and "despite her

-8-

difficulties and disagreements with the owners," she "quickly and continuously came back to the restaurant" (id.). The court found that Krist had not proven that Coopertown's owners or employees "made her feel that she was not welcome [at the restaurant] because she had a disability." (Id. at 306.)

The court accepted Krist's testimony that after she began bringing the dog to Coopertown "[m]any of her friends were no longer as friendly" and that her "circle of friends" changed; and it found that on "approximately two or three occasions one of the owners yelled at her about the dog and the dog's handling or the dog's conduct." (Tr. 299.) However, the court found that although

> she was not treated as friendly as she had been treated before[,] . . . . the ADA doesn't prohibit the conduct at issue here, complaining about the dog's handling and the dog's behavior, even if done in a rude and insensitive manner--if I could even characterize it as that[. That] is not what the ADA is intended to reach. This may have been thought of like Cheers, but the ADA does not guarantee that kind of atmosphere. The ADA prohibits discrimination and denial of use and enjoyment of public facilities.

(Id. at 299-300.)

Without making a finding as to whether the owners' comments or shouts of which Krist complained actually were rude or insensitive, the court found that "on this record I cannot conclude that she was in any way, regardless of what the statements were, excluded from this restaurant, [or] that she in any way did not have

-9-

full access to all of the facilities that she had access to before and utilized . . . ." (Id. at 301.)

The district court also noted that there was "absolutely no evidence of any discriminatory intent" on the part of the restaurant's owners and employees. (Tr. 300; see, e.g., id. at 302 ("I cannot reasonably determine on these facts as they are presented, even accepting them in the light most favorable to the plaintiff, that these individuals intended to discriminate against her and in fact discriminated against her"); id. at 303 ("there is no evidence that these individuals had any animosity toward the plaintiff . . . personally and clearly not because she was disabled").)

The court found that the occasions on which one of the Kolombos owners yelled or shouted across the restaurant about the dog's behavior were "isolated" and that their conduct was neither "outrageous" nor "demeaning" so as to constitute a "constructive denial of access" to the restaurant or its services. (Tr. 301.) It ruled that the ADA "does not require" that owners of a public restaurant "not complain, not ask the dog's owner to control the dog's behavior in a way that is not inconsistent with everyone else's use of the restaurant." (Id. at 306.)

Although the court noted that Krist ceased frequenting Coopertown in the fall of 2009, it was not persuaded that the

decision to do so was forced upon her by Kolombos. Rather, the court stated that Krist's decision may have been motivated by her "frustration [at] the breakdown of her social network" (id.) as well as by the fact that she was about to bring suit against Kolombos and desired to "protect[] the viability of the lawsuit" (id. at 301).

Judgment was entered in favor of Kolombos on all of Krist's claims.

# II. DISCUSSION

On appeal, Krist argues principally that the judgment should be reversed on the grounds that the district court erroneously interpreted Title III of the ADA (or "Title III") as requiring a plaintiff to prove discriminatory intent, and that the court erred in failing to find that she was actually excluded from Coopertown or that the Coopertown owners' yelling at her constructively excluded her from the restaurant. She contends that Title III imposes on public restaurants a requirement of civility. We reject Krist's contention that Title III imposes a civility code, and we see no error in the findings or conclusion of the district court.

Title III of the ADA prohibits, as a "[g]eneral rule," discrimination against an individual "on the basis of disability in

the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases . . . or operates a place of public accommodation," 42 U.S.C. § 12182(a), e.g., a "restaurant . . . serving food or drink," id. § 12181(7)(B). The Act defines discrimination to include, to the extent pertinent in this action,

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods[ and] services . . . to individuals with disabilities, unless . . . such modifications would fundamentally alter the nature of such goods[ and] services.

42 U.S.C. § 12182(b)(2)(A)(ii). Regulations issued under Title III by the Department of Justice shortly after the ADA was enacted, which were effective until March 15, 2011, provided that "[g]enerally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 36.302(c)(1) (1992); see also 28 C.F.R. § 36.302(c) (2011) (effective Mar. 15, 2011) (elaborating on accommodation requirements for individuals with disabilities aided by service animals).

In order to state a claim for violation of Title III, which authorizes private actions only for injunctive relief, not monetary damages, see, e.g., Powell v. National Board of Medical

Examiners, 364 F.3d 79, 86 (2d Cir. 2004), a plaintiff must "establish that (1) he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA," Roberts v. Royal Atlantic Corp., 542 F.3d 363, 368 (2d Cir. 2008), cert. denied, 129 S. Ct. 1581 (2009); see Camarillo v. Carrols Corp., 518 F.3d 153, 156 (2d Cir. 2008) ("Camarillo").  Only the third element is at issue here.

In reviewing a judgment entered after a bench trial, we "must not . . . set aside" the district court's findings of fact "unless [they are] clearly erroneous."  Fed. R. Civ. P. 52(a)(6); see, e.g., Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985); Banker v. Nighswander, Martin & Mitchell, 37 F.3d 866, 870 (2d Cir. 1994).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574.

Further, in determining whether factual findings are clearly erroneous, we are required to "give due regard to the trial court's opportunity to judge the witnesses' credibility."  Fed. R. Civ. P. 52(a)(6).  It is within the province of the district court as the trier of fact to decide whose testimony should be credited. See, e.g., Anderson, 470 U.S. at 574.  And as trier of fact, the

-13-

judge is "entitled, just as a jury would be, see, e.g., Robinson v. Cattaraugus County, 147 F.3d 153, 160 (2d Cir.1998); Fiacco v. City of Rensselaer, 783 F.2d 319, 325 (2d Cir.1986), cert. denied, 480 U.S. 922 . . . (1987), to believe some parts and disbelieve other parts of the testimony of any given witness." Diesel Props S.r.l. v. Greystone Business Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011). We are not allowed to second-guess the bench-trial court's credibility assessments. See, e.g., Anderson, 470 U.S. at 573-74.

We review the district court's conclusions of law, and its application of the law to the facts, de novo. See, e.g., Henry v. Champlain Enterprises, Inc., 445 F.3d 610, 617-18, 623 (2d Cir. 2006); FDIC v. Providence College, 115 F.3d 136, 140 (2d Cir. 1997). "[M]ixed questions of law and fact are reviewed either de novo or under the clearly erroneous standard[,] depending on whether the question is predominantly legal or [predominantly] factual." United States v. Skys, 637 F.3d 146, 152 (2d Cir. 2011) (internal quotation marks omitted).

Given these principles, we see no basis for disturbing the decision of the district court. Preliminarily, we note that we are inclined to agree with Krist that a Title III plaintiff who proves that she is disabled within the meaning of the ADA and that the defendant operates a place of public accommodation that failed to make reasonable modifications in its policies, etc., as necessary to

provide her with the goods and services afforded by the defendant need not also prove that discrimination was intended. The Act, which is designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), noted, among Congress's findings, that individuals with disabilities had "continually encounter[ed] _various_ forms of discrimination, _including_ outright intentional exclusion . . . _and_ . . . failure to make modifications to existing facilities and practices" _id_. § 12101(a)(5) (emphases added). This language itself is antithetical to any suggestion that the ADA was intended to allow recovery only for intentional discrimination. _See generally_ _PGA Tour, Inc. v. Martin_, 532 U.S. 661, 675 (2001).

However, we do not see that the district court viewed intent to discriminate as an element of a Title III claim. Krist also asserted a claim for punitive damages under the City Human Rights Code (_see_ Complaint ¶ 35), under which an award of punitive damages may be available upon a showing of intent to discriminate in violation of that law, _see generally_ _Farias v. Instructional Systems, Inc._, 259 F.3d 91, 101-02 (2d Cir. 2001) (discussing City Code § 8-502(a)). Given Krist's attorney's emphasis on the Kolombos owners' knowledge of the law and on Krist's desire for an award of punitive damages, the district court's references to intent were

relevant to her City Code claim and were responsive to Krist's testimony suggesting, inter alia, that Batas had growled at the dog in a manner calculated to bait the dog into barking and that the Kolombos owners "hope[d]" she would leave and not return.

Nor do we see that the absence of evidence of intent was a linchpin of the court's decision to dismiss Krist's ADA claim. Rather, the court found that Krist failed to establish by a preponderance of the evidence that she was excluded from Coopertown after she acquired her service dog (the only period of which she complains); or that her service dog was excluded; or that her access to Coopertown, with or without the dog, was restricted. Although Krist states that the court erred "in rejecting [her] proof that she was actually excluded by [Kolombos] from the diner based on her use of a service dog" (Krist brief on appeal at 31 (emphasis added)), the district court as trier of fact was not required to credit her testimony to that effect. The court's contrary finding that Krist frequented the restaurant with the dog in a manner that was "not significantly different" from her prior custom was supported by its findings that, over a period of some 10 months, Krist went to the restaurant with the dog "dozens and dozens" of times. This finding was supported by the testimony of Batas and Michael Kolombos that Krist had come to the restaurant with her dog some 90-100 times (see Tr. 222, 243), and by the testimony of Krist herself that during

-16-

that 10-month period, except in January, March, and April, she went to Coopertown every other day (see, e.g., id. at 70, 78, 114). The district court's finding that Krist was neither ordered to leave Coopertown nor asked not to return cannot, on this record, be termed clearly erroneous.

Further, although Krist also argues that the district court erred in failing to find that she was the victim of a "constructive exclusion" (Krist brief on appeal at 31 (emphasis added)), there is no clear error in the court's finding that any shouts by the owners were isolated and that the restaurant employees' behavior was not outrageous or demeaning verbal harassment. The court found that there were only "approximately two or three occasions" in the 10-month period when one of the owners yelled at her, and that the yelling concerned the dog's conduct or Krist's handling of the dog. (Tr. 299.) The court was not required to accept Krist's suggestion that the instances were numerous.

The court's finding that there was no constructive exclusion is also supported by the record that Krist continued to frequent the restaurant, with the dog, some 3-4 times a week; that she continued to sit in her preferred booth when it was available; and that she and the dog normally stayed at the restaurant for several hours on each visit.

Nor was the court required to accept Krist's assertion that shouted criticisms of her handling of the dog or its conduct were unjustified or any suggestion that they were designed to drive her from the premises. For example, the last two "yelling" incidents described by Krist occurred in February and September 2009 when Batas and Michael Kolombos, respectively, yelled at her across the restaurant for having put the dog in the aisle, potentially impeding customer traffic and waiter movements. One was an occasion when Krist was sitting at a table under which the dog could not comfortably lie because of the configuration of the base of the table. Krist had sat at the table despite the availability of seven booths (i.e., all but her favorite) at which she could have sat and put the dog under a booth table. The other occasion was one in which she was sitting in her favorite booth but put the dog in the aisle because of a previous incident in which the dog had found and eaten some indigestible food on the floor under the booth's table; Krist offered no evidence that there was still--or again--food under the table. Thus, with respect to two of the four occasions as to which she complained of yelling, Krist's own testimony supported an inference that she had placed the dog in the aisle unnecessarily and that the shouted requests concerned her creation of a safety hazard, because someone passing by could trip on the dog either as it lay there or because it might suddenly move.

In sum, we see no basis for overturning the district court's findings that Krist was neither actually nor constructively excluded from Coopertown and that she was not denied any of its goods or services.

Finally, we reject Krist's contention that "in effect, . . . Title III of the ADA imposes a civility code" (Transcript of oral argument of the present appeal at 4 (statement of Krist's counsel)). Although Krist complains that her friends at Coopertown became less friendly after she began bringing the dog, and that the owners shouted at her when she did not properly place the dog in a position where it could not suffer or cause harm, "careful attention to the requirements of the statute," Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998), reveals that Title III is designed to prevent a facility offering public accommodation from denying individuals with disabilities "goods[ and] services," e.g., 42 U.S.C. §§ 12182(a), 12182(b)(2)(A)(ii). We agree with the district court that the ADA does not impose a civility code. See, e.g., Camarillo, 518 F.3d at 157 (vacating Fed. R. Civ. P. 12(b)(6) dismissal of a plausible Title III denial-of-service claim, while "not disagree[ing] . . . that legislation such as the ADA cannot regulate individuals' conduct so as to ensure that they will never be rude or insensitive to persons with disabilities" (internal quotation marks omitted)); cf. Cannice v. Norwest Bank Iowa N.A.,

-19-

189 F.3d 723, 726 (8th Cir. 1999) ("Insensitivity alone does not amount to harassment; [Title I of] the ADA, like Title VII [of the Civil Rights Act of 1964], is not in effect a 'general civility code.'" (quoting Oncale, 523 U.S. at 81)).

Krist also complains that the district court, in its findings, made no mention of her claims under the State Human Rights Law or the City Human Rights Code. The judgment expressly dismissed all three of Krist's claims, and there is no basis for reversal. The State-law claim is coextensive with Krist's Title III claim, see, e.g., Camarillo, 518 F.3d at 158, and her challenge to the dismissal of the State-law claim thus lacks merit for the reasons discussed above with respect to Title III. The City Code provides somewhat broader rights and is to be "given an independent liberal construction," see, e.g., Loeffler v. Staten Island University Hospital, 582 F.3d 268, 278 (2d Cir. 2009) (internal quotation marks omitted); but we can hardly doubt that the district court considered Krist's claim under the City Code independently, for the court's findings with regard to discriminatory intent were pertinent to punitive damages, which could not have been awarded except under the City Code. In any event, aside from the arguments with respect to her ADA claim, Krist's brief on appeal contains no authority or argument as to how the court erred in dealing with her City-law claim, and we consider any independent challenge to the dismissal of

that claim to be abandoned, see Hobbs v. County of Westchester, 397 F.3d 133, 147 (2d Cir.), cert. denied, 546 U.S. 815 (2005); Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir.), cert. denied, 525 U.S. 1001 (1998).

## CONCLUSION

We have considered all of Krist's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.