Charron v. Sallyport Global Holdings

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 1st day of March, two thousand sixteen.

PRESENT:
> RALPH K. WINTER,
> PETER W. HALL,
> CHRISTOPHER F. DRONEY,
> *Circuit Judges*.

---

Thomas W. Charron, Jr., Individually and as trustee of the Thomas W. Charron Jr. Grantor Retained Annuity Trust dated July 8, 2010,

> *Plaintiff-Counter-Defendant-Appellee*,

> v.                                             15-256

Sallyport Global Holdings, Inc., JPD Private Trust Company, Ltd., as Trustee of the GPD Charitable Trust dated December 7, 2010, Gian Paul Deblasio, AKA John P. DeBlasio,

> *Defendants-Counter-Claimants-Appellants,*

John Doe, as trustee of the John Deblasio Charitable Trust for World Peace and Development, Sallyport Global Services, Ltd., as Trustee of the John Deblasio Charitable Trust for World Peace and Development,

> *Defendants.*

FOR PLAINTIFF-COUNTER-DEFENDANT-
APPELLEE:

FOR DEFENDANTS-COUNTER-
CLAIMANTS-APPELLANTS:

BRIAN A. GLASSER, TILLMAN J.
BRECKENRIDGE, Bailey & Glasser
LLP, Charleston, WV.

LISA SCHIAVO BLATT, Arnold &
Porter LLP, Washington, DC.

DAVID SCOTT FLUGMAN, JAY P.
LEFKOWITZ, Kirkland & Ellis LLP,
New York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Pauley, III, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Plaintiff-appellee Thomas Charron and defendant-appellant John DeBlasio are the former joint owners of defendant-appellant Sallyport Global Holdings, Inc. ("SGH"). When their relationship soured, Charron and DeBlasio worked out a contract pursuant to which SGH bought Charron's interest in the company. That contract included a provision (the "Windfall Provision") stating that if DeBlasio sold the company within one year at a sufficient price, then Charron would get to share in the proceeds of the sale. DeBlasio sold SGH within one year, but DeBlasio refused to pay Charron anything under the Windfall Provision because he claimed the sale price was less than the $65 million threshold price under that provision. Charron sued for breach of contract.[1] Following an eight-day bench trial addressing the proper interpretation of the Windfall Provision

---

1 DeBlasio also counterclaimed for theft, conversion, and unjust enrichment, but the district court's findings and conclusions with respect to those claims have not been appealed.

2

and the true price at which DeBlasio sold SGH, the district court found in favor of Charron on his breach of contract claim and awarded him damages under the Windfall Provision. DeBlasio now appeals. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal. For the reasons stated below, we affirm.

"In reviewing a district court's decision in a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo." *Bessemer Trust Co., N.A. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010) (quotation omitted). The district court's interpretation of contractual language is a matter of law that we review *de novo*, *Collins v. Harrison-Bode*, 303 F.3d 429, 432 (2d Cir. 2002), but its findings of fact about the intent of contracting parties are reviewed for clear error, *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 528 (2d Cir. 2004). In addition, we are "not allowed to second-guess the bench-trial court's credibility assessments." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012).

We are presented with two primary questions on appeal: (1) whether DeBlasio's sale of SGH to DC Capital (the "DC Capital Transaction") triggered the Windfall Provision; and if so, (2) what portion of that sale price is Charron entitled to receive under the Windfall Provision? We consider each in turn. For ease of reference, we reproduce the full text of the Windfall Provision here:

> 2.04 <u>Windfall Protection</u>. As additional consideration for [Charron's] Shares, [SGH] agrees to make an additional payment to [Charron], on the basis and subject to the limitations provided in this Section 2.04. If, on or prior to the first anniversary of the date hereof, John DeBlasio or any of his affiliates or any other direct or indirect equity holder sells or agrees to sell shares of [SGH]'s capital stock (or equity of an intervening Person or assets of [SGH] or any [SGH] subsidiary) constituting 20% or more by voting power or economic value of [SGH]'s assets or equity to a third party in one or a series of related transactions for a price that reflects an enterprise value of [SGH] equal to or greater than $65,000,000 (a "Windfall Sale"), within three Business Days following the closing of such

3

Windfall Sale, [SGH] or such stockholder shall pay [Charron] an amount equal to 20% of the proceeds received from the Windfall Sale, such payment to be made to [Charron] *pro rata* in accordance with the percentages set forth on <u>Schedule I</u>.

J.A. at 2727-28. Because the parties both interpret this contract under New York law, we too apply New York law in our analysis. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law." (quotation omitted)).

## A. Whether the Windfall Provision Was Triggered

At the outset, we note the parties both acknowledge there is no standard definition of "enterprise value." Both parties' experts define the term generally as the overall value of the entire business—in other words, the value of its anticipated future cash flows.

DeBlasio first argues that the Windfall Provision was never triggered because the DC Capital Transaction, as valued by DeBlasio and DC Capital, reflected a total price of SGH of only $64.5 million. He contends the phrase "reflects an enterprise value" in the Windfall Provision would be relevant only if DeBlasio sold less than 100% of SGH. For example, if he sold only 50% of SGH's equity for $35 million, then that transaction would "reflect" an implied enterprise value of $70 million. But because he sold the entire company, DeBlasio argues, the $64.5 million price tag he and DC Capital assigned to this deal necessarily "reflect[s] the total 'enterprise value' of [SGH]."

In interpreting a contract,

[o]ur function is to apply the meaning intended by the parties, as derived from the language of the contract in question. *Lopez v. Fernandito's Antique*, 305 A.D.2d 218, 219, 760 N.Y.S.2d 140 (2003). A "written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002). In searching for the intent of the parties, our goal must be

4

to accord the words of the contract their "fair and reasonable meaning." *Heller v. Pope*, 250 N.Y. 132, 135, 164 N.E. 881 (1928). In other words, "the aim is a practical interpretation of the expressions of the parties to the end that there be a 'realization of [their] reasonable expectations.'" *Brown Bros. Elec. Contrs. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 400, 393 N.Y.S.2d 350, 361 N.E.2d 999 (1977) (quoting 1 Corbin, Contracts, § 1).

*Duane Reade, Inc. v. Cardtronics. LP*, 863 N.Y.S.2d 14, 16 (1st Dep't 2008).

DeBlasio argues that because courts may not rewrite the terms of a contract when its terms are clear and unambiguous, *see, e.g.*, *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992), the district court cannot rewrite the terms of his contract with DC Capital. This argument misleadingly focuses on the wrong agreement. DC Capital is not a party to this case and Charron was not a party to the DC Capital Transaction. We are tasked with interpreting the contract between DeBlasio, or SGH, and Charron—the contract that includes the Windfall Provision. As to that contract DeBlasio neither provides a reasonable explanation why, nor presents any extrinsic evidence showing that, he and Charron intended the Windfall Provision to function so that DeBlasio's unilateral (with respect to Charron) and potentially arbitrary valuation of SGH's equity in a subsequent sale would control Charron's potential proceeds from that sale. *See Duane Reade*, 863 N.Y.S.2d at 16 ("[O]ur goal must be to accord the words of the contract their fair and reasonable meaning." (quotation omitted)).

The district court pointed out the absurdity of DeBlasio's interpretation. We agree. This interpretation might make sense in a pure cash-for-equity deal, but where, as here, the sellers are paid partly in cash and partly in rollover equity shares in the purchasing corporation, the total face value or "price" of the deal as stated in the deal documents need not and may very well not reflect the true value of those equity shares or the total value of SGH. The $64.5 million face value of the DC Capital Transaction may well be an arbitrary label. For example, DeBlasio and DC Capital

could have agreed SGH was worth $74.5 million and DeBlasio's 38% equity share was worth $13.8 million, but agreed to list the equity share as being worth $3.8 million and the total sale price as $64.5 million. As the district court explained, "[a]fter agreeing to pay $60.7 million in cash and 38% of the acquiring entity, any value 'assigned' to the equity stake would not affect the economics of the deal. While the deal as a whole may be the product of an arm's length transaction, it does not follow that the rollover equity is actually worth the $3.8 million attributed to it." SPA at 10.

To be sure, DeBlasio's interpretation is reasonable insofar as he argues that he and Charron used the word "reflect" to establish a fair and proportional total value of SGH in a situation where DeBlasio sells more than 20% but less than 100% of SGH. Indeed, this captures the ordinary meaning of "reflect," which is to "[e]mbody or represent (something) in a faithful or appropriate way," e.g., "stocks are priced at a level that reflects a company's prospects." *Reflect*, Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/reflect (last visited Feb. 29, 2016). DeBlasio inexplicably contends, however, that when 100% of SGH's shares are sold, the word "reflects" takes on an entirely different meaning. In that case, he implies, "reflects" actually means "states." Thus, whatever dollar amount the DC Capital Transaction sale documents state SGH is worth automatically becomes the total enterprise value of SGH for purposes of the Windfall Provision. DeBlasio offers no reasonable explanation why "reflect" would mean one thing when less than 100% of shares are sold but another thing when 100% of shares are sold. Absent evidence to the contrary, we assume that DeBlasio and Charron intended "reflect" to take on its ordinary meaning in all situations arising under the Windfall Provision. The plain meaning of the phrase "a price that reflects an enterprise value of [SGH] of

6

[at least $65 million]" is something along the lines of: *a dollar amount that faithfully or appropriately represents an enterprise value of SGH of at least $65 million.* The district court implicitly adopted such a definition and thus did not err in declining to accept blindly the $64.5 million price tag on the DC Capital Transaction as the true enterprise value of SGH. Moreover, the record is replete with evidence that the DC Capital Transaction was not what it seemed and that no one truly valued SGH at $64.5 million. The enterprise value reflected in the DC Capital Transaction was a factual issue to be determined by the judge as factfinder.

Having determined that the enterprise value reflected in the DC Capital Transaction was an issue of fact, this case becomes quite simple. Charron presented an expert to assess the value of the rollover equity interest that DeBlasio received in the DC Capital Transaction, and appellants did not. Using conservative cash-flow projections, Charron's expert opined that DeBlasio's rollover equity interest was worth $20,133,126. The district court found credible most of Charron's expert's testimony and ultimately found that the value of DeBlasio's rollover equity interest was $18,286,578. It did not clearly err in doing so.

The district court also included in its valuation of SGH two loans that Charron alleged DeBlasio stripped out of SGH shortly before the closing of the DC Capital Transaction. Charron claimed these assets should be considered part of DeBlasio's compensation and the district court agreed. This was a factual determination, which we review for clear error, because it went toward determining the enterprise value of SGH for purposes of the Windfall Provision. The parties' experts agreed that whether these loans are properly included in the enterprise value of SGH turns on whether they were operating assets. Although there was some evidence that these loans were not essential to SGH's business, the district court relied upon the fact that in connection with the

7

DC Capital Transaction SGH and its subsidiaries listed these loans among their material contracts in the ordinary course of business. It also found credible an email sent by a DC Capital executive to DeBlasio expressing concern that DeBlasio planned to transfer one of these two loans to himself personally even though it was a "working capital investment borne 100% by Sallyport." SPA at 25. We cannot disturb the district court's credibility determinations, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

As to the value of those two loans, Charron's expert opined that they were worth $2.75 million together, and appellants' expert did not dispute that estimate. The district court thus included that amount in its calculation of the enterprise value reflected in the DC Capital Transaction. Adding that figure to the $18,286,578 value of DeBlasio's rollover equity interest and the $60.7 million in cash, the district court found SGH's enterprise value as reflected in the DC Capital Transaction to be $81,736,578. We see no clear error in these findings.

**B. What Portion of the Sale Price Is Charron Entitled to Receive?**

In the event of a Windfall Sale, i.e., if the Windfall Provision has been triggered, DeBlasio must pay Charron "an amount equal to 20% of the proceeds received from the Windfall Sale." J.A. at 2728.

Charron contends this entitles him to 20% of all proceeds received, while DeBlasio argues that he must pay 20% only of the proceeds above the $65 million threshold. DeBlasio relies on a Black's Law Dictionary definition of "windfall," but ignores the fact that the Windfall Provision expressly defines a Windfall Sale as a "s[ale of] shares of [SGH]'s capital stock . . . for a price that reflects an enterprise value of [SGH] equal to or greater than $65,000,000," J.A. at 2727. The

8

plain language of the Windfall Provision obligates DeBlasio to pay 20% of "*the proceeds received from the Windfall Sale*," J.A. at 2728 (emphasis added), not some of the proceeds or proceeds above a certain price. The inclusion of the phrase "equal to" in the triggering provision would make no sense if DeBlasio's interpretation was adopted. The district court properly rejected DeBlasio's interpretation and gave effect to the plain meaning of the provision.

Finally, DeBlasio's argument that the contract should be reformed to reflect a windfall provision that applies only incrementally above a certain threshold price has no merit. Although DeBlasio identified evidence showing that he and Charron initially considered his approach to the Windfall Provision during negotiations, J.A. at 2846-49, there is no evidence that the parties mutually intended to adopt that approach. *See Healy v. Rich Products Corp.*, 981 F.2d 68, 73 (2d Cir. 1992) (holding that party seeking contract reformation must show by clear and convincing evidence that "both parties to a bilateral transaction share the same erroneous belief and their acts do not in fact accomplish their mutual intent" (ellipsis and quotation omitted)).

We have considered all of appellants' remaining arguments and find them to be without merit. The judgment of the district court is **AFFIRMED**.

> FOR THE COURT:
> Catherine O'Hagan Wolfe, Clerk

9